## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MICHAELA HEMPHILL,
c/o National Student Legal Defense
Network
1015 15th Street Northwest, Suite 600
Washington, D.C. 20005

VICTORIA VENCES, and
c/o National Student Legal Defense
Network
1015 15th Street Northwest, Suite 600
Washington, D.C. 20005

MIKE CHRISTOU,
c/o National Student Legal Defense
Network
1015 15th Street Northwest, Suite 600
Washington, D.C. 20005

*on behalf of themselves and all others
similarly situated,*

　　　　　*Plaintiffs,*

v.

MIGUEL CARDONA, *in his official
capacity as Secretary of the United States
Department of Education,*
400 Maryland Avenue Southwest
Washington, D.C. 20202,

AND

THE UNITED STATES DEPARTMENT
OF EDUCATION,
400 Maryland Avenue Southwest
Washington, D.C. 20202

　　　　　*Defendants.*

Civil Action No. 22-cv-1391

**CLASS ACTION COMPLAINT
FOR DECLARATORY AND
INJUNCTIVE RELIEF**

**INTRODUCTION**

1.      Named Plaintiffs Michaela Hemphill, Victoria Vences, and Mike Christou are three of the thousands of students who were fraudulently induced by Westwood College to enroll in its Criminal Justice program in the state of Illinois through Westwood's misleading and deceptive promises about the value of a degree and promises around career services and preparation.

2.      Recognizing—and having uncovered—Westwood's misconduct, the Office of the Illinois Attorney General ("IL AG") filed an application ("Westwood Group Application") with the United States Department of Education ("Department") five-and-a-half years ago, seeking federal student loan discharges on behalf of Named Plaintiffs and thousands of other students like them: individuals who borrowed federal student loans to attend (or on behalf of someone who attended) Westwood's Criminal Justice program in Illinois from 2004 until the school closed in March of 2016.

3.      The Westwood Group Application was submitted as a "borrower defense to repayment," pursuant to provisions in the federal Higher Education Act ("HEA"), the Department's implementing regulations, and terms in federal student loan Master Promissory Notes that provide for federal student loan discharges based on institutional misconduct. After an extensive investigation and litigation, the IL AG concluded that Westwood engaged in a "pattern and practice of deception surrounding its criminal justice program in Illinois," and that Westwood had "violated the Illinois Consumer Fraud Act."

4.      While the Westwood Group Application has been pending, the Department has (a) relied on the facts and evidence included within the Westwood Group Application (including the extensive evidence provided as part of the Application) to grant borrower defense applications submitted *by individuals*; (b) granted "borrower defense" discharge to other large *groups of students*, from institutions other than Westwood, without those students having either submitted applications or having applications submitted on their behalf; and (c) been subject to court rulings that it has a legal obligation to issue a decision on group claims for relief submitted by state attorneys general.[1]

5.      Notwithstanding the Department's reliance on the evidence contained in the Westwood Group Application, the Department's acknowledgment (and use) of legal authority to issue group borrower defense discharges, and its legal obligation to issue a decision on group claims submitted by state attorneys general, the Department has failed to issue a reasoned decision on the Westwood Group Application.

6.      As described by the IL AG, in findings accepted by the Department, students covered by the Westwood Group Application have been encumbered, in

---

[1]      As the IL AG stated in a June 2019 letter to then-Secretary DeVos, the Department is "require[d] . . . to review [and issue a decision on] group discharge applications submitted by state attorneys general." *See* Ltr. from Atty. Gen. Kwame Raoul to Sec'y Elizabeth DeVos at 2 (June 3, 2019), https://www.illinoisattorneygeneral.gov/pressroom/2019_06/Letter_to_ED_Re_Group_Discharge_for_Westwood_and_Corinthian.pdf (citing *Williams v. DeVos*, No. 16-11949-LTS, 2018 WL 5281741, at *10 (D. Mass. Oct 24, 2018); *see also Vara v. DeVos,* No. CV 19-12175-LTS, 2020 WL 3489679, at *26 (D. Mass. June 25, 2020), *appeal dismissed sub nom. Vara v. Cardona*, No. 20-1832, 2021 WL 4057798 (1st Cir. July 21, 2021) ("[T]he [Department] [is] not free to simply ignore such an application.")

some cases for as long as eighteen years, by unlawful debt they should not have to repay.

7.     The Department's failure to render a reasoned decision—considering the findings it has already made—constitutes a constructive denial of the application, which is arbitrary, capricious, and contrary to law. The proper remedy for its constructive denial is a full loan discharge for, and refund of amounts already paid by, all borrowers identified in the application.

8.     The failure to render a reasoned decision also constitutes an unlawful and unreasonable delay under the Administrative Procedures Act.

9.     The Department's constructive denial and unreasonable delay harms all individuals in the Westwood Group Application, but these harms are disproportionately shouldered by borrowers who are already marginalized in higher education and experience heightened levels of economic insecurity—namely Black and Latinx students.

10.     During the time span that Westwood engaged in widespread deception and misrepresentation, Westwood enrolled a disproportionately high number of Black and Latinx students. From 2004–2015—the time span covered by the Westwood Group Application—Black students comprised 43.5% of students attending Westwood's four Illinois campuses, which is approximately three times the percentage of college students in Illinois who identify as Black. Likewise, Latinx students comprised 21.2% of Westwood's four Illinois campuses, which is approximately one and a half times the percentage of college students in Illinois

who identify as Latinx. Black and Latinx borrowers are particularly vulnerable to the crippling consequences that stem from the Department's failure to act upon the Westwood Group Application. Due to generations of discriminatory and government-sanctioned wealth-stripping policies, Black and Latinx borrowers have less wealth than their white peers and earn lower wages once in the workforce even when controlling for education level. Against this economic backdrop, Black students, on average, assume greater debt to fund their education. Twelve years after entering college, Black and Latinx borrowers owe a significantly greater proportion of their loans and default at higher rates. By failing to adjudicate the Westwood Group Application's requested relief that disproportionately impacts Black and Latinx borrowers, the Department's actions serve to exacerbate already significant racial disparities in wealth, education, and economic mobility.

11.     Named Plaintiffs, on behalf of themselves and all others similarly situated who were identified in the Westwood Group Application, seek: (1) a declaration that the Department's failure to issue a reasoned decision on the Westwood Group Application amounts to an arbitrary and capricious constructive denial, in violation of 5 U.S.C. § 706(2)(A); (2) an order directing the Department to fully discharge the loans of each student named in the Westwood Group Application; or, in the alternative, (3) a declaration that the Department's five-and-a-half year delay constitutes "agency action unlawfully withheld or unreasonably delayed" pursuant to 5 U.S.C. § 706(1) and ordering the agency to issue a decision on the Westwood Group Application within 60 days of the Court's Order.

## JURISDICTION AND VENUE

12.     This action arises under the Administrative Procedure Act (APA), 5

U.S.C. §§ 701-706, and the HEA, 20 U.S.C. § 1001, *et seq*. This Court has

jurisdiction over this case as it arises under federal law. 28 U.S.C. § 1331.

13.     Venue is proper in this district because Secretary Miguel Cardona, an

officer of the United States, resides and performs his official duties here as

Secretary of Education, 28 U.S.C. § 1391(e)(1)(A), and many of the events giving

rise to this action took place here, 28 U.S.C. § 1391(e)(1)(B).

14.     This Court is authorized to grant the relief requested in this case

pursuant to the APA, 5 U.S.C. § 706, the Declaratory Judgment Act, 28 U.S.C.

§§ 2201–2202, the Higher Education Act, 20 U.S.C. § 1082, and Federal Rule of

Civil Procedure 23.

## PARTIES

15.     Plaintiff Michaela Hemphill is a resident of Brooklyn Center,

Minnesota, and identifies as Black. She took out federal student loans to attend

Westwood's Criminal Justice program in 2006 and 2007. On information and belief,

Ms. Hemphill was identified in the IL AG's group borrower defense application, on

which the Department has not rendered a reasoned decision.

16.     Plaintiff Victoria Vences is a resident of East Chicago, Indiana, and

identifies as Hispanic and of Mexican descent. She took out federal student loans to

attend Westwood's Criminal Justice program from 2007 to 2010. On information

and belief, Ms. Vences was identified in the IL AG's group borrower defense application, on which the Department has not rendered a reasoned decision.

17.    Plaintiff Mike Christou is a resident of Hanover Park, Illinois, and identifies as white. He took out federal student loans to attend Westwood's Criminal Justice program from 2008 to 2011. On information and belief, Mr. Christou was identified in the IL AG's group borrower defense application, on which the Department has not rendered a reasoned decision.

18.    Defendant Miguel Cardona is the Secretary of Education (the "Secretary"), and is charged by statute with the supervision and management of all decisions and actions of the United States Department of Education. The Secretary oversees and is responsible for federal student loan programs. See 20 U.S.C. § 1070(b). Plaintiffs sue Secretary Cardona in his official capacity.

19.    Defendant United States Department of Education is an agency of the United States, within the meaning of the APA, 5 U.S.C. § 701(b)(1). It is responsible for overseeing and implementing rules for the federal student aid program.

## STATEMENT OF FACTS

### *Statutory and Regulatory Framework*

20.    The loans at issue in this case were issued under Title IV of the HEA, 20 U.S.C. §§ 1070–1099, which provides the statutory authorization for federal student loans, including the Federal Family Education Loan ("FFEL") and Direct Loan programs.

21.     Under the FFEL program, private lenders issued student loans, which were then insured by guaranty agencies and in turn reinsured by the Department. *Id.* § 1078(b)–(c). Since July 1, 2010, no new loans can be made under the FFEL program.

22.     Under the Direct Loan program, the federal government directly issues student loans to eligible borrowers for use at "participating institutions of higher education" as approved by the Department. *See* 20 U.S.C. § 1087a.

23.     Direct Loans and FFEL loans have the same terms, conditions, and benefits. 20 U.S.C. § 1087e(a)(1).

24.     On information and belief, borrowers included in the Westwood Group Application borrowed FFEL and Direct loans to pay for their own or their child's attendance at Westwood.

***Borrower Defense***

25.     "Borrower defense to repayment" or "borrower defense" refers to an assertion that a federal student loan is void or unenforceable due to misconduct by the borrower's school.

26.     Beginning on January 1, 1994, the Department issued a Common Application/Promissory Note for all FFEL Program loans, providing that the borrower is entitled to assert as a defense to repayment of the loan, "all claims and defenses that the borrower could assert against the school." This provision was later incorporated into the Department's FFEL regulations, Federal Perkins Loan Program, Federal Family Education Loan Program, and William D. Ford Federal

Direct Loan Program, 72 Fed. Reg. 61,960 (Nov. 1, 2007) (adopting 34 C.F.R. § 682.209(g)).

27.     In 1993, Congress altered the terms and conditions of Direct Loans to allow for student loan borrowers to seek cancellation of their loans on the basis of school misconduct. Omnibus Budget Reconciliation Act of 1993, Pub. L. No. 103-66, 107 Stat. 312. The statute directs that "the Secretary shall specify in regulations . . . which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a loan made under this part[.]" 20 U.S.C. § 1087e(h).

28.     Pursuant to this directive, the Secretary promulgated a regulation that permitted a Direct Loan borrower to assert, as a defense to repayment, "any act or omission of the school attended by the student that would give rise to a cause of action against the school *under applicable state law*." 34 C.F.R. § 685.206(c)(1) (emphasis added). This regulation became effective July 1, 1995 and applies to loans taken out prior to July 1, 2017. *Id.*; *see* 34 C.F.R. § 685.222(a).

29.     Given that the Named Plaintiffs and each member of the proposed class took out federal student loans to attend Westwood no later than March 8, 2016, when the school stopped operating, and that the IL AG submitted the Westwood Group Application in November 2016—all well before July 1, 2017—the state law standard under the 1995 borrower defense regulation applies to the Westwood Group Application.

30.     The law requires the Department, and it has been its practice, to place federal student loans in forbearance and cease collection activities upon receipt of a

borrower defense application. At times, it has also been the Department's practice to cancel interest that accrues on a federal student loan after a certain period of time while that loan is in forbearance pending resolution of a borrower defense application. The borrowers on whose behalf the Westwood Group Application was asserted have been deprived of the benefits of these practices.

***The Secretary is Required to Adjudicate Group Borrower Defense Applications Submitted by State Attorneys General; and Borrower Defense May Be Granted With or Without Applications***

31.    The Secretary is required to issue reasoned decisions on borrower defense applications submitted by state attorneys general. *See, e.g.*, *Vara v. DeVos,* No. 19-12175-LTS, 2020 WL 3489679, at *6 (D. Mass. June 25, 2020) ("[T]he texts of the HEA and the 1995 borrower defense regulation, as well as [the Department's] contemporaneous interpretations, contracts, and adjudicatory practices, demonstrate that the agency must adjudicate affirmative applications for borrower defense relief," and that the Department had a "duty to render reasoned, non-arbitrary decisions as to each borrower who took out loans on behalf of students listed in [the application]."); *Williams v. Devos*, No. 16-cv-11949-LTS, 2018 WL 5281741, at *15 (D. Mass. Oct. 24, 2018) (requiring the Department to determine the validity of a group borrower defense application brought by the Massachusetts Attorney General as to two Corinthian College borrowers).

32.    The Department is "not free to simply ignore such an application." *Vara*, 2020 WL 3489679, at *26.

33.     In addition, the Department has the authority, and has used its authority, to grant borrower defense relief even when a borrower has not applied for such relief or where no application has been submitted on the borrower's behalf. For example, on April 28, 2022, the Department announced that it was providing borrower defense relief to borrowers of loans incurred to attend the Marinello Schools of Beauty, even for borrowers who "have not yet applied for a borrower defense discharge." Press Release, U.S. Dep't of Educ., Education Department Approves $238 Million Group Discharge for 28,000 Marinello Schools of Beauty Borrowers Based on Borrower Defense Findings (April 28, 2022), https://www.ed.gov/news/press-releases/education-department-approves-238-million-group-discharge-28000-marinello-schools-beauty-borrowers-based-borrower-defense-findings.

***The Illinois AG Investigates and Takes Action Against Westwood***

34.     In 2011, the IL AG began an investigation of Westwood and its Illinois campuses. The primary purpose of the investigation was to determine if Westwood misrepresented the ability of its graduates to pursue careers in law enforcement. *See, e.g.*, *Westwood Statement of Facts Memo (Part 1),* Fed. Student Aid at 5 [hereinafter "Westwood Facts Part 1"], https://studentaid.gov/sites/default/files/Westwood-sections-I-III_redacted.pdf (last visited May 18, 2022).

35.     On January 18, 2012, the IL AG filed suit against Westwood for violations of the Illinois Consumer Fraud and Business Deceptive Practices Act.

Westwood Facts Part 1 at 6. The IL AG's allegations included that Westwood had misrepresented:

    a.  That a Criminal Justice degree would help students get jobs as police officers;

    b.  The potential salaries, placement and employment rates for Criminal Justice graduates;

    c.  Its accreditation status;

    d.  The transferability of credits; and

    e.  The projected cost to attend.

*See* Westwood Facts Part 1 at 6–7.

36.    While the litigation was pending, the IL AG received documents from Westwood, took depositions, and gathered other evidence in support of its claims. *See* Westwood Facts Part 1 at 7.

37.    In October 2015, the IL AG settled the lawsuit, and Westwood agreed to discharge all institutional loans for Illinois criminal justice students since the inception of the program in Illinois, amounting to over $15 million in loan forgiveness.

38.    The IL AG settlement, however, did not include relief for federal loans taken out by, or on behalf of, Westwood <u>students</u>. Consequently, upon information and belief, many students, including Named Plaintiffs, who enrolled at Westwood colleges because of Westwood's misconduct were not fully compensated by the settlement.

***The Illinois AG Files the Westwood Group Application, Which the
Department Then Ignores for Five-and-a-Half Years***

39.     On November 28, 2016, the IL AG submitted the Westwood Group

Application on behalf of thousands of Illinois students who attended Westwood's

Criminal Justice program from 2004 until the school closed in March of 2016. *See*

Westwood Facts Part 1 at 7.

40.     As part of the Westwood Group Application, the IL AG provided the

Department with a "plethora of materials evidencing Westwood's patterns and

practice of deception surrounding its criminal justice program in Illinois," including

the IL AG's trial brief, proposed findings of fact, proposed conclusions of law, over

700 proposed trial exhibits, call transcripts between school representatives and

prospective students, deposition transcripts, expert reports, [and] interrogatory

responses. The Department has acknowledged receiving this evidence. *See*

Westwood Facts Part 1 at 7.

41.     As part of the Westwood Group Application, the IL AG wrote that a

group discharge was particularly appropriate "because individual student

applications are not necessary to establish actual reliance, which is not an element

of a claim under section 2 of the [Illinois Consumer Fraud Act]. *Siegel v. Levy Org.

Dev. Co.*, 153 Ill. 2d 534, 542 (1992) ('[s]ignificantly, the Act does not require actual

reliance.')."

42.     The Westwood Group Application identified and provided a list of

defrauded students, including all Illinois criminal justice students at Westwood

between July 1, 2006 and June 30, 2013 and all students who had institutional

loans discharged through the IL AG's settlement, including students who attended Westwood's Illinois criminal justice program from 2004 through September 2015.

43.    The IL AG stated that the materials "provided comprehensive and largely irrefutable evidence that Westwood engaged in a pattern and practice of deception surrounding its criminal justice program in Illinois by misrepresenting or omitting material facts concerning career outcomes, accreditation, cost of tuition, and financing, with the intent that students rely on such misrepresentations and omissions."

44.    On December 9, 2016, Senator Richard Durbin sent a letter to the Department stating that the IL AG "suit and underlying evidence make clear that Westwood's deceptive practices give rise to a cause of action under Illinois law, thereby qualifying approximately 3,600 Westwood criminal justice students in Illinois to federal student loan relief under the Department's borrower defense to repayment regulation[.]" Senator Durbin also "encouraged the Department to make these discharges available to students covered by the [IL AG's] evidence without requiring students to attest to reliance on any particular Westwood claim, given that such reliance is not required under the applicable state law."

45.    On December 13, 2016, the IL AG sent a follow-up letter, noting that Westwood's criminal justice degree in Illinois, "produced disastrous results for its students: nearly 80% of students dropped out, while the typical graduate earns only $22,048," in spite of Westwood "[c]harging over $75,000 for its criminal justice degree." Westwood Facts Part 1 at 8. The IL AG encouraged the Department to

"grant group discharge[s]" to Illinois students who attended Westwood's criminal justice program "based on the comprehensive evidence [her] office submitted evidencing Westwood's violations of the Illinois Consumer Fraud Act."

46.     On January 4, 2017, the IL AG sent an additional letter to the Department in which she described the "voluminous" evidence previously provided and asked the Department to "designate a point person in FSA's Student Aid Enforcement Unit to head up" the review of the Westwood Group Application.

47.     On May 6, 2022, the IL AG sent an additional letter to the Department again asking the Department to grant the Westwood Group Application, specifically highlighting the Department's reliance on, and agreement with, the Westwood Group Application in its factual findings. *See* Letter from Ill. Att'y Gen. Kwame Raoul to Sec'y Miguel Cardona, Undersecretary  James Kvaal, and Fed. Student Aid Chief Operating Off. Richard Cordray (May 6, 2022),

https://illinoisattorneygeneral.gov/pressroom/2022_05/202256-ILAGLettertoDOEreWestwoodGroupDischargeApplication.pdf.

48.     The Department has confirmed receipt of the Westwood Group Application on multiple occasions. For example, in May 2019, the Department provided to Congress a list of pending borrower defense applications submitted by state attorneys general, which included the Westwood Group Application. *See* Exhibit A, Letter from Sen. Richard J. Durbin, *et al.* to Betsy DeVos, Sec'y of Educ., U.S. Dep't of Educ., at 1 n.4, 6 (June 18, 2019).

49.     In August 2019, following a request by numerous members of the United States Senate to provide an "update on the status of each of the group discharge applications," the Department confirmed that the Westwood Group Application was under "review." *See* Exhibit B, Response from Diane Auer Jones, Principal Deputy Under Sec'y, U.S. Dep't of Educ., to Sen. Richard J. Durbin (Aug. 6, 2019).

50.     The Department has also specifically referred to the Westwood Group Application as a "group application" for borrower defense relief and a "request for group borrower defense relief." To date, five-and-a-half years after the Westwood Group Application was filed, the Department has not issued a final determination on that application.

51.     In contrast, it took the Department just *six months* to adjudicate a similar group application, related to a different school, submitted by the Massachusetts Attorney General's Office in 2016. *See Vara*, 2020 WL 3489679, at \*5 (describing application on behalf of students from American Career Institute).

***The Department Made Findings Based on the Westwood Group Application That Support Granting the Westwood Group Application***

52.     Despite its failure to issue a reasoned decision on the Westwood Group Application, the Department relied on the information contained in that Application to make findings about Westwood's misconduct that it relied upon to approve hundreds of defense applications submitted by individual borrowers.

53.     On July 9, 2021, the Department announced that it would discharge the debts of borrowers who submitted individual borrower defense applications

asserting one of two types of claims related to Westwood College. *See* U.S. Dep't of Educ., Press Release, *Department of Education Approves Borrower Defense Claims Related to Three Additional Institutions* (July 9, 2021),

https://www.ed.gov/news/press-releases/department-education-approves-borrower-defense-claims-related-three-additional-institutions (hereinafter "July 2021 Findings").

54.     In the July 2021 Findings, "the Department found that, from 2002 through its 2015 closure, all of Westwood's campuses across the country engaged in widespread misrepresentations about the ability of students to transfer credits." *Id.* In addition, "the Department found that from 2004 until its closure in 2015, Westwood made widespread, substantial misrepresentations to students that its criminal justice program would lead to careers as police officers in Illinois, particularly in the Chicago area." *Id.* Based on these findings, the Department announced that it had approved over 1,600 claims, representing approximately $53 million in relief to former Westwood students. *Id.*

55.     On February 16, 2022, the Department announced a third finding against Westwood, "that from 2002 through its closure in 2015, Westwood College (Westwood) made widespread and substantial misrepresentations to students about their salary potential and likelihood of finding a job after graduating." *See* U.S. Dep't of Educ., Press Release, *Education Department Approves $415 Million in Borrower Defense Claims Including for Former DeVry University Students* (Feb. 16, 2022), https://www.ed.gov/news/press-releases/education-department-approves-415-

million-borrower-defense-claims-including-former-devry-university-students

("February 2022 Findings").

56.     As announced in the February 2022 Findings, the Department

approved full discharges of approximately $53.1 million for approximately 1,600

Westwood borrowers. *Id.* It stated that "[c]ombined, the Department has now

approved approximately 4,100 claims and approximately $130 million in discharges

for students who attended Westwood." *Id.*

57.     Since issuing those findings, the Department has published two

undated Executive Summaries of its findings on its website,[2] along with two

undated documents ("Westwood Statement of Facts") describing, in detail, the

information it relied upon and conclusions it reached in deciding to grant individual

borrower defense claims from former Westwood students.[3]

58.     As it relates to the Criminal Justice program in Illinois, the

Department's Executive Summary states the following:

---

[2]

*Westwood Employment Prospects Executive Summary*, Fed. Student
Aid, https://studentaid.gov/sites/default/files/Westwood%20College%20Employment%20Prospects%2
0Borrower%20Defense%20Executive%20Summary.pdf (last visited May 18, 2022).

[3] *See* Westwood Facts Part 1; *Westwood Statement of Facts Memo (Part 2),* Fed. Student Aid
[hereinafter short cite], https://studentaid.gov/sites/default/files/Westwood-section-IV-
redacted.pdf  (last visited May 18, 2022)

**Westwood Misled Prospective Students to Believe That Its Criminal Justice Degree Would Make Them Eligible to Work as Police Officers in Illinois**

This section explains that from May of 2004 to November of 2015, Westwood misrepresented to prospective Illinois Criminal Justice students that they would be able to obtain employment as police officers in Illinois, particularly in the Chicago area. Westwood made these representations through its television advertising, internet marketing, and through the direct statements of its admissions representatives during telephone calls and in-person meetings with prospective students on a widespread basis. In fact, major law enforcement employers in the Chicago area, including the Chicago Police Department and the Illinois State Police, required candidates for police officer positions to possess a minimum number of credit hours or a degree from a regionally accredited college. Westwood knew that this regional accreditation requirement applied to most police officer jobs in Illinois, particularly in the Chicago area. Westwood was never regionally accredited; instead, it was nationally accredited. Thus, Westwood graduates were not eligible for most police officer jobs in the Chicago area.

Even though Westwood graduates may have possessed the minimum stated requirements for some police officer positions (for example, in 2010, the Chicago Police Department changed its job requirements to state that candidates with credit hours from nationally accredited institutions would be considered), such a small percentage of Westwood graduates gained employment in police officer positions that Westwood's representations that they could become police officers were still misleading.

59.     The Westwood Statement of Facts contains Departmental findings regarding misrepresentations by Westwood about its Illinois Criminal Justice program. In reliance on the "evidence in [its] possession"—including that provided by the IL AG—the Department issued the following conclusion:

### D.   Conclusions

The evidence in the possession of BDG relating to Westwood's misrepresentations regarding its graduates' ability to become police officers after graduation establishes the following facts by a preponderance of the evidence:

- From 2004 to 2015, Westwood's television advertising and internet marketing were targeted at prospective students in the Chicago area, and created the impression that its bachelor's degree in Criminal Justice would lead to careers as police officers after graduation. This advertising and marketing was misleading because most police officer positions in the Chicago area required credits or a degree from a regionally accredited school, and Westwood was not regionally accredited.

- Between 2004 and 2015, Westwood's admissions representatives directly told prospective students in the Chicago area that they could be police officers with a Westwood degree. These statements were misleading for the same reason Westwood's television advertising and internet marketing were misleading.

- Also between 2004 and 2015, some admissions representatives told students they would be able to work as police officers for specific agencies, including the Chicago Police Department and Illinois State Police, which required credits or a degree from a regionally accredited college. Such statements regarding the Chicago Police Department were false from 2004 to 2010; such statements regarding the Illinois State Police and other area police departments were false throughout the time Westwood offered its Criminal Justice program.

- Even after 2010, when the Chicago Police Department changed its requirements to state that it would consider candidates for police officer positions who had earned a minimum number of credit hours from a nationally accredited college, Westwood's representations that its graduates could work for the Chicago Police Department were misleading because the evidence indicates that it was highly unlikely that a Westwood graduate would ever become a police officer with the Chicago Police Department.

60.   Despite relying on the information in the Westwood Group Application to make findings that Westwood misrepresented graduates' ability to become police officers, and acting on those findings to fully discharge the federal student loans of students in that program who filed individual applications, the Department has not acted on those exact same findings to discharge the federal student loans of

20

identically situated students named in the Westwood Group Application who did
not submit an individual application.

61.     The findings that "from 2002 through its 2015 closure, all of
Westwood's campuses across the country engaged in widespread misrepresentations
about the ability of students to transfer credits," and "that from 2002 through its
closure in 2015, Westwood College (Westwood) made widespread and substantial
misrepresentations to students about their salary potential and likelihood of finding
a job after graduating" also apply, by their terms, to the students named in the
Westwood Group Application, but the Department has not acted on them to
discharge their loans.

### Harm to Named Plaintiffs and the Putative Class

62.     The Department's illegal delay in adjudicating and/or constructively
denying the Westwood Group Application has caused material harm to Named
Plaintiffs and the proposed class, who have been burdened by student loans that
they were fraudulently induced to take out.

63.     By failing to issue a decision on the Westwood Group Application
and/or constructively denying the Westwood Group Application, Named Plaintiffs
continue to have fraudulently induced student loans appear on their credit reports,
with negative implications.

64.     Because of the Department's failure to issue a decision on the
Westwood Group Application and/or constructive denial of the Westwood Group
Application, Named Plaintiffs have a current obligation to repay their federal

student loans. That obligation requires them to resume payments on, or shortly after, August 31, 2022, when the COVID-19 related student loan repayment "pause" expires.

65.     Because of the Department's failure to issue a decision on the Westwood Group Application and/or constructive denial of the Westwood Group Application, Named Plaintiffs have experienced emotional distress, psychological harms, and anxiety.

66.     If the Department had treated the Westwood Group Application as a valid borrower defense application, as the law requires, Named Plaintiffs and the proposed class would have received the option to put their loans into forbearance pending the Department's decision regarding the application.

67.     If the Department had not unlawfully withheld or unreasonably delayed action on the Westwood Group Application, Named Plaintiffs and the proposed class also would have received a reasoned response to that application. Even if it were an adverse decision, they would have had the opportunity to appeal that final decision administratively within the Department and/or in federal court. All Named Plaintiffs are further harmed because, as soon as the payment pause is lifted, interest will once again accrue on their Direct unsubsidized loans used to attend Westwood.

### *Michaela Hemphill*

68.     Michaela Hemphill was enrolled in the Criminal Justice program at Westwood in Illinois during 2006 and 2007, when she withdrew. Prior to her

enrollment, Ms. Hemphill was told by Westwood representatives that a Westwood degree would prepare her for a career in criminal justice. She withdrew from the program in or around 2007, after learning that Westwood was not regionally accredited and therefore did not qualify her for desired jobs in the criminal justice field. Ms. Hemphill subsequently transferred to a different institution that would not accept her Westwood credits because of issues regarding Westwood's accreditation.

69.     Ms. Hemphill is currently unemployed and has never been able to find work in the criminal justice field.

70.     Ms. Hemphill borrowed a combination of subsidized and unsubsidized FFEL Loans to pay for her attendance at Westwood.

71.     She originally took out $8833 in federal student loans to attend Westwood. Her current balance is approximately $16,425 in principal and $2,253 in interest.

### Victoria Vences

72.     Victoria Vences was enrolled in the Criminal Justice program at Westwood in Illinois from January 2007 until October 2010, when she withdrew from the program. Prior to her enrollment, Ms. Vences was told by Westwood representatives that a Westwood degree would prepare her for a career in criminal justice. She withdrew from the program in October 2010 after learning that Westwood was not regionally accredited and therefore did not qualify her for desired jobs in the criminal justice field.

73.    Ms. Vences currently works as a skills assessor for the Illinois Domestic Violence hotline, in a position that is unrelated to the training she had (and was promised) at Westwood.

74.    Ms. Vences borrowed a combination of subsidized and unsubsidized FFEL Loans to pay for her attendance at Westwood.

75.    She originally took out $36,594 in federal student loans to attend Westwood. Her current balance is approximately $42,621 in principal and $16,627 in interest.

***Mike Christou***

76.    Mike Christou was enrolled in the Criminal Justice program at Westwood in Illinois from 2008 to 2011, when he withdrew. Prior to his enrollment, Mr. Christou was told by Westwood representatives that a Westwood degree would prepare him for a career in criminal justice. After learning that Westwood was not regionally accredited and therefore would not qualify him for his desired jobs in the criminal justice field, Mr. Christou attempted to transfer to a different school. He was told that his Westwood credits would not transfer, so he decided to finish his program at Westwood since he had already invested his time and money into the program.

77.    Mr. Christou is currently employed as a service writer at a car dealership. Since graduating from Westwood, he has worked in sales, and has never found work in a position using his criminal justice degree.

78.   Mr. Christou borrowed a combination of subsidized and unsubsidized

FFEL and Direct Loans to pay for his attendance at Westwood.

79.   He originally took out $30,273 in federal student loans to attend

Westwood. His current balance is approximately $11,200 in principal and $0 in

interest.

## CLASS ACTION ALLEGATIONS

80.   Named Plaintiffs seek to represent a class of all individuals who:

> (i) took out a federal student loan pursuant to Title IV of the Higher
> Education Act in connection with their own or their child's enrollment
> in the Criminal Justice program at Westwood College in Illinois
> between 2004 and the school's closure in March 2016; (ii) are identified
> in the Westwood Group Application; (iii) have not yet received a
> favorable decision as to a borrower defense application; and (iv) have
> not otherwise had all of their Westwood federal student loans forgiven
> or cancelled with a refund of sums already paid.

81.   All borrowers identified in the Westwood Group Application took out

federal student loans to pay for their (or, through a federal Parent PLUS loan, their

child's) attendance at Westwood.

82.   The proposed class satisfies the requirements of Rule 23(a) and (b)(2)

of the Federal Rules of Civil Procedure.

83.   The class is so numerous that joinder of all members is impracticable.

According to the IL AG's Second Amended Complaint against Westwood, and

Westwood's Answer, Westwood's criminal justice program in Illinois enrolled

approximately 7,530 students who incurred at least some tuition cost while enrolled

in Westwood's criminal justice program in Illinois from 2004 through 2013. *See*

Second Am. Complaint, *People of the State of Illinois v. Alta Colleges, Inc.*, No. 14-

cv-3786, Dkt. 57 ¶ 255 (N.D. Ill., Sept. 30, 2014); Answer, *People of the State of Illinois v. Alta Colleges, Inc.*, No. 14-cv-3786, Dkt. 58 ¶ 255 (N.D. Ill., Oct. 3, 2014).

84.    The Westwood Group Application requested a group discharge of federal student loans on behalf of all or substantially all of these students. On information and belief, all or nearly all of these students took out federal student loans to finance their attendance and/or had parents take out federal student loans on their behalf. On information and belief, a significant portion of loans incurred by members of the proposed class have not been refunded or otherwise discharged.

85.    The size of the class is at least forty people. The exact number of class members can be readily determined using the Department's records.

86.    The nature of relief sought, as well as questions of fact and law, are common to all members of the class.

87.    The Department's failure to issue a reasoned decision on the Westwood Group Application is identical for the entire class, all of whom are covered by the application. The Department's challenged actions therefore apply generally to the class, making declaratory relief regarding those actions appropriate for the class as a whole.

88.    Named Plaintiffs' claims are typical of the claims of the proposed class. On information and belief, the grounds for discharging the federal loans of Named Plaintiffs, like all members of the proposed class, are included in the IL AG's Westwood Group Application. Named Plaintiffs' claims also arise out of the same course of conduct and rely on the same legal theories as the claims of the proposed

class. In this case, each of the Named Plaintiffs and the proposed class members: (i) took out federal student loans to attend Westwood; (ii) were identified by name in the IL AG submission as a result of the violations of Illinois law to which they were subject; (iii) continue to be burdened by federal student loans despite the IL AG's submission; and (iv) seek relief that sets aside the Department's action as arbitrary and capricious and awards them a full loan discharge that they are entitled to under Illinois law, or in the alternative compels the Department to issue a reasoned decision on the merits of the Westwood Group Application.

89.   Named Plaintiffs' claims are typical of the claims of the proposed class. On information and belief, Named Plaintiffs, like all members of the proposed class, are identified in the IL AG's Westwood Group Application. Named Plaintiffs' claims also arise out of the same course of conduct and rely on the same legal theories as the claims of the proposed class.

90.   Named Plaintiffs are capable of and committed to fairly and adequately protecting the interests of the class and have no conflicts with other class members.

91.   Named Plaintiffs are represented by counsel experienced in higher education law, administrative law, the borrower defense to repayment regulations, and class action litigation.

92.   A class is appropriate under Federal Rule of Civil Procedure 23(b)(2) because the Department's failure to issue a reasoned decision after nearly six years

applies generally to the class, such that final injunctive relief or corresponding

declaratory relief is appropriate with respect to the class as a whole.

## CAUSES OF ACTION

### COUNT I
### Violation of the APA, 5 U.S.C. § 706(2) for Constructive Denial of the Westwood Group Application

93.     Plaintiffs repeat and incorporate by reference each of the foregoing

allegations as if fully set forth herein.

94.     Defendants have violated the APA, 5 U.S.C. § 706(2), by constructively

denying the Westwood Group Application without providing any reasons for its

action.

95.     Defendants have violated the APA, 5 U.S.C. § 706(2), by constructively

denying the Westwood Group Application while granting individual claims for

similarly situated borrowers who filed individual applications.

96.     Pursuant to the APA, a court "shall [] hold unlawful and set aside

agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not

in accordance with law." 5 U.S.C. § 706(2)(A).

97.     "Agency action" includes the "failure to act." 5 U.S.C. § 551(13).

98.     The Westwood Group Application is a valid borrower defense

application on behalf of Named Plaintiffs and the proposed class.

99.     Defendants' failure to issue a reasoned decision on the Westwood

Group Application amounts to constructive denial of the Westwood Group

Application, the effect of which is the same as the effect of denying relief: Named

Plaintiffs and members of the class remain subject to collection on the loans that are the subject of the Westwood Group Application among other adverse consequences.

100.   Defendants have not provided any explanation for why they have constructively denied the Westwood Group Application, which they are required to do. *See Vara*, 2020 WL 3489679, at *30; *see also* 5 U.S.C. § 555(e) ("Prompt notice shall be given of the denial in whole or in part of a written application, petition, or other request of an interested person made in connection with any agency proceeding. Except in affirming a prior denial or when the denial is self-explanatory, the notice shall be accompanied by a brief statement of the grounds for denial.").

101.   Defendants' failure to provide any reasoning to explain why they have constructively denied the Westwood Group Application is therefore arbitrary, capricious, and not in accordance with law under 5 U.S.C. § 706(2)(A). *See Vara*, 2020 WL 3489679, at *30 (holding that the Department's "failure to render a reasoned decision justifying its denial of the [Massachusetts AG's group borrower defense] Application is arbitrary, capricious, and contrary to law").

102.   Defendants' failure to treat all borrowers identified in the Westwood Group Application the same way they treated otherwise identical borrowers who submitted individual applications is arbitrary, capricious, and not in accordance with law under 5 U.S.C. § 706(2)(A).

103.    Defendants' constructive denial of the Westwood Group Application has harmed Named Plaintiffs and members of the proposed class.

**COUNT II**
**Violation of the APA, 5 U.S.C. § 706(1) for Failure to Issue a Reasoned Decision on the Westwood Group Application**

104.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations as if fully set forth herein.

105.    Defendants have an obligation to adjudicate all borrower defense claims submitted by or on behalf of federal student loan borrowers.

106.    The Westwood Group Application is a valid borrower defense application on behalf of Named Plaintiffs and the proposed class.

107.    Defendants have failed to issue a decision on the Westwood Group Application, even though the valid application has been pending for nearly five-and-a-half years.

108.    Defendants' failure to adjudicate the Westwood Group Application constitutes an agency action unlawfully withheld and unreasonably delayed, within the meaning of 5 U.S.C. § 706(1).

109.    Under the APA, a "reviewing court shall . . . compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

110.    A "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review." 5 U.S.C. § 706(2).

111.    Defendants' inaction and delay has harmed Named Plaintiffs and members of the proposed class.

## REQUESTED RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter a judgment in their favor and grant the following relief:

A.    Certify the class as defined in paragraph 80, pursuant to Federal Rule of Civil Procedure 23;

B.    Declare that Defendants' constructive denial of the Westwood Group Application is arbitrary and capricious, and vacate the constructive denial on that basis;

C.    Declare that Defendants' failure to issue a reasoned decision on the merits is unlawful, and vacate the constructive denial on that basis;

D.    Declare that all borrowers identified in the Westwood Group Application are entitled to full loan discharges, including a refund of amounts already paid;

E.    In the alternative, declare that Defendants' delay in adjudicating the Westwood Group Application is unreasonable and compel Defendants to issue a reasoned decision on the merits of the Westwood Group Application within 60 days of the Court's Order;

F.    Award reasonable costs and attorneys' fees as authorized by law; and

G.    Grant such further relief as may be just and proper.

Respectfully submitted,

/s/ Daniel A. Zibel

Stuart T. Rossman* (MA BBO No. 430640)
Kyra Taylor** (D.C. Bar No. 1510681)
NATIONAL CONSUMER LAW CENTER
7 Winthrop Square, Fourth Floor
Boston, MA 02110
(617) 542-8010
srossman@nclc.org
ktaylor@nclc.org

Daniel A. Zibel (D.C. Bar No. 491377)
Eric Rothschild (D.C. Bar No. 1048877)
NATIONAL STUDENT LEGAL DEFENSE
NETWORK
1015 15th Street NW, Suite 600
Washington, DC 20005
(202) 734-7495
dan@defendstudents.org
eric@defendstudents.org

Jon Greenbaum (D.C. Bar No. 489887)
David Hinojosa*** (D.C. Bar No. 1722329)
Genevieve Bonadies Torres** (D.C. Bar No. 1602433)
Chavis Jones**** (D.C. Bar No. 1739219)
LAWYERS' COMMITTEE FOR CIVIL
RIGHTS UNDER LAW
1500 K Street, NW, Suite 900
Washington, DC 20005
Telephone: (202) 662-8600
Facsimile: (202) 783-0857
jgreenbaum@lawyerscommittee.org
dhinojosa@lawyerscommittee.org
gbonadies@lawyerscommittee.org
cjones@lawyerscommittee.org

*application for admission *pro hac vice* forthcoming
**application for admission to D.D.C. forthcoming
***application for admission to D.D.C. pending
**** Practice is supervised by one or more D.C. Bar members and admitted to the Bar under D.C. App. R. 46-A (Emergency Examination Waiver); application for admission *pro hac vice* forthcoming

May 19, 2022

*Attorneys for Plaintiffs and Proposed Class*

32