UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MICHAELA HEMPHILL, et al., <br><br> Plaintiffs, <br><br> v. <br><br> LINDA MCMAHON, Secretary of the United States Department of Education, et al., <br><br> Defendants. | Civil Action No. 22-CV-1391 |

**JOINT STATUS REPORT**

Pursuant to this Court's September 10 and November 26, 2025 Minute Orders, the parties provide this joint status report.

**Joint Statement**

This case seeks class-wide relief pursuant to 5 U.S.C. § 706 on behalf of certain students who enrolled in the Criminal Justice program at Westwood College in Illinois and are part of a request submitted in 2016 by the Illinois Attorney General's Office to the U.S. Department of Education to have their federal student loans discharged. Plaintiffs filed an Amended Complaint on August 17, 2022. ECF No. 18. Defendants, Linda McMahon, in her official capacity as the Secretary of Education, and the United States Department of Education (together, "the Department") filed an Answer to Plaintiffs' Amended Complaint on August 25, 2022. ECF No. 19. There are no pending briefing deadlines in the case.

A summary of the Department's decision to discharge all remaining federal student loans for Westwood College borrowers, and the Department's actions following that decision, are provided in the parties' prior Joint Status Reports ("JSRs"). *See, e.g.*, ECF No. 46. As noted, the

Department's consistent position, across at least three Administrations, is that the Department is obligated to effectuate relief that has been finally approved, even if the steps to effectuate it are incomplete, and that any amount finally approved for relief reflects unenforceable debt that cannot be legally collected. *Id.* at 3. To that end, eligible loans, including any consolidation loan that includes eligible loans, will remain paused in forbearance or stopped collections unless the borrower expressly opts out of forbearance or stopped collections. *Id.* Likewise, any future attempts to collect on or enforce repayment obligations on eligible loans would be without any legal basis and the Department is legally required to eventually effectuate the discharges, refunds, and other relief described above, as the notices of the Department's final action explained. *Id.*

The Department provides the below updates to the data found on page 4 of the previous JSR (filed on September 8), *see id.* at 4, with new statistical categories added in bold for the sake of clarity and identification.

> Of those borrowers with <u>only</u> Department-held loans, approximately 43,700 borrowers (or 89%) have received discharges **and approximately 5,600 borrowers have discharges outstanding or possibly incomplete.**[1] Of those borrowers with <u>only</u> FFEL loans not held by the Department, approximately 7,700 borrowers (or 91%) have received discharges **and approximately 800 borrowers have discharges outstanding or possibly incomplete**. Of those borrowers who have a mix of qualified FFEL and Department-held loans, approximately 12,500 borrowers (or 61%) have received discharges **and approximately 8,000 borrowers have discharges outstanding or possibly incomplete**. In addition, discharges are currently in process for approximately 14,400 borrowers (or 18%) in the three different categories combined.

As with numbers provided in previous JSRs, these statistical categories vary from those reported before July 2024 due to the reliance in this report on National Student Loan Data Systems

---

[1] For purposes of this paragraph, "possibly incomplete" generally means that the Department has not yet confirmed that the loan has been fully discharged (even though, in fact, the discharge may be complete). This is intended to err on the side of underreporting, rather than overreporting, completed discharges.

("NSLDS") data rather than servicer data and also because these numbers have been updated to reflect borrower-based information, which more accurately reflects the status of borrowers' discharges, rather than loan-based information. *See* ECF No. 36 at 4 (describing the change in methodology). The Department has also clarified that the data is rounded and may not sum precisely.

On September 30, 2025, the Department provided Plaintiffs the below chart with additional information regarding the roughly 14,500 Westwood borrowers whose relief (at that time) had not been determined to be complete. The chart compares those borrowers "with" incomplete consolidation loans and borrowers "without" incomplete consolidation loans. A consolidation loan is a new federal loan incurred to pay off one or more existing federal loans, potentially loans incurred at different times to attend different schools, but possibly associated with the borrower's eligible Westwood school loans.

| Description | Borrower Count | # of Incomplete School Loans | # of Possibly-Incomplete Intermediary Consolidation Loans | # of Possibly-Incomplete Terminal Mixed Consolidation Loans | # of Incomplete Terminal All-Eligible Consolidation Loans |
|---|---|---|---|---|---|
| 1 - Borrowers With Incomplete Consols | 14,000 | 3,600 | 3,500 | 19,500 | 6,500 |
| 2 - Borrowers Without Incomplete Consols | 500 | 1,200 | | | |
| | 14,500 | 4,800 | 3,500 | 19,500 | 6,500 |

[Quoted text hidden]

In subsequent communications, at Plaintiffs' request, the Department provided additional details regarding the chart above. According to the Department:

> **Intermediary consolidation loans** are consolidation loans that have themselves been consolidated, such as if the borrower consolidates their loans multiple times. These intermediary consolidation loans reflect a $0 outstanding balance because they were paid through a consolidation, but the Department is unable to confirm that the "adjustment" and "refund/reallocation" processes have been completed on these loans by the loans' servicer(s) using the data reported to NSLDS. Hence they are listed as "possibly incomplete."
>
> **Terminal mixed consolidation loans** are consolidation loans that likely consist of

3

both eligible (i.e. Westwood school loans) and ineligible (i.e. loans from a non-Westwood school) school debts—hence the term "mixed"—and which have not been consolidated—hence the term "terminal" as opposed to "intermediary." Because some portion of the mixed consolidation loan balance is attributable to a loan which is not eligible for the Westwood group discharge (for example, if a borrower also has loans from a community college or state university), the consolidation loan is expected to remain outstanding even after the eligible Westwood debts have been fully discharged and removed from the consolidation loan. Because loan servicers do not report the reasons for adjustments on loans, the Department is unable to directly confirm that an adjustment of the correct amount has been made using the data reported to NSLDS. Therefore, terminal mixed consolidation loans are considered to be "possibly incomplete" if they do not have a discharge record directly applied to the loan.

**Terminal all-eligible consolidation loans** are consolidation loans which likely consist of only eligible school debts—hence the term "all-eligible" in contrast to the term "mixed"—and which have not themselves been consolidated—hence the term "terminal" as described above.

With respect to both intermediary consolidation loans and terminal mixed consolidation loans, the Department also informed Plaintiffs that "it is possible that many of these loans have been fully processed, and the borrower has received full relief, including refunds/reallocation of loan payments, adjustment of credit lines, and a discharge or reduction of the consolidation loans."

The Department has described its current process for discharging consolidation loans as "complex." Under this process, the Department must reach back to the *original* servicer of a Westwood loan and then instruct all subsequent servicers to make corresponding "adjustments" throughout the loan's history through each consolidation. (Servicers can change for a variety of reasons, including leaving the business or when a loan is consolidated or reconsolidated.) The Department explains:

> The process of relief starts from the underlying loans first obtained to attend Westwood. At the point in which those loans are discharged, adjustment requests are sent to the consolidation originator to make additional downward adjustments on the loan. If there are multiple consolidations, which include the same or additional loans for Westwood, this process will continue until all adjustments have

4

been completed and the borrower has been provided full relief, including any applicable refunds and credit corrections.

According to the Department, some of the original Westwood school loans and Department-held consolidation loans "were serviced by companies which no longer have servicing contracts with [the Department], in which cases discharging the loans requires some hands-on review by personnel at the new servicer."

As indicated in the chart, approximately 14,000 out of 14,500, or 97%, of Westwood borrowers with outstanding loans had consolidation loans as to which the Department is unable to confirm have been adjusted to account for the now-dischargeable debt or otherwise fully discharged. For these approximately 14,000 borrowers, there are approximately 29,500 outstanding consolidation loans.

## Specific Responses to Court Order

In its September 10, 2025 Minute Order, the Court directed the parties to include three categories of information in this JSR. Those categories, and the parties' responses, are as follows.

1. **Defendants' estimate as to when they can expect to complete the discharges for borrowers with (a) only Department-held loans; (b) only Federal Family Education Loans (FFEL); and (c) a mix of FFEL and Department-held loans.**

The Department remains committed to effectuating the remaining discharges for eligible Westwood borrowers as expeditiously as practicable and will strive to do so for all three categories of loans by the end of March 2027. The Department's ability to meet that estimated completion date will be impacted by a number of factors. Specifically, the Department is currently working toward the effectuation of relief for borrowers in *Sweet v. McMahon*, 19-cv-03674-WHA (N.D. Cal.) pursuant to a court-approved settlement, including meeting the court-ordered relief deadlines in that case. The Department has a deadline of January 28, 2026 to adjudicate the remaining

5

approximately 198,000 borrower-defense applications at issue in that case, and a deadline of January 28, 2027 to provide discharges and refunds for the relevant loans. The Department recently moved to extend the January 28, 2026 deadline by 18 months, to July 28, 2027, with any relief due to borrowers still being required one year after the borrower's application is adjudicated. The district court is holding a hearing on that extension motion today (December 11, 2025).

If the Department's extension motion is granted in whole or in part, the Department and its servicers will have some additional availability to work on effectuating the relief for the remaining, eligible Westwood borrowers, which will increase the likelihood of completion by March 2027. If the motion is denied, however, the Department expects to be issuing instructions to servicers on a very high volume of loans that must be effectuated for relief by January 2027. In that case, the Department will be working closely with the servicers over the next year to monitor servicers' work toward completion as well as any other ongoing batch of borrowers that must be completed as required in the *Sweet* settlement. All of this will adversely impact the Department's ability to effectuate the remaining relief for Westwood borrowers by March 2027.[2] The Department will provide an update to this Court in the next JSR as to the status of its *Sweet* extension motion and any other relevant updates.

---

[2] Plaintiffs suggest that the Department's workload constraints in *Sweet* do not impact its ability to effectuate the remaining Westwood discharges. *See infra* at 9. That is incorrect. The Department has limited resources, and it has had to prioritize those resources towards meetings its court-ordered settlement obligations in *Sweet*. Those obligations are not limited to the adjudication of borrower-defense claims as Plaintiffs indicate, *see id.*; they include the need to identify the loans that must be discharged and to provide instructions to servicers and oversee servicers' effectuation of the discharges. Further, while Plaintiffs note that the Department anticipates being able to hire approximately 450 new contract attorneys to adjudicate borrower-defense claims, *see id.*, those potential staffing resources will be dedicated to meet any extended deadline the court sets in *Sweet*.

In addition to and aside from *Sweet*, in discharging the Westwood loans, the Department cannot predict what obstacles or circumstances may arise with respect to servicers' timelines. As previously explained, *see, e.g.*, ECF No. 45 at 4, at this stage of the discharge process the Department is continuing to process more complex loans, which require it to conduct additional analysis on the populations, redistribute any additional files to servicers for processing, and implement additional monitoring to ensure completion. The Department reiterates that all of the loans—Department-held or otherwise—for the three named Plaintiffs in this case have been discharged. *See, e.g.*, ECF No. 46 at 4.

2. **Summary of Plaintiffs' Concerns About the Implementation of Relief Thus Far**

Plaintiffs filed this lawsuit in May 2022 asserting that the Department's failure to act upon a "group borrower defense" application submitted by the Illinois Attorney General's office in November 2016 regarding former Westwood College students constituted an arbitrary constructive denial of that application (Count 1, 5 U.S.C. § 706(2)) and was an agency unlawfully withheld and unreasonably delayed (Count 2, 5 U.S.C. § 706(1)). In August 2022, the Department announced that it would discharge the debts of all former Westwood students dating back to January 2002, an announcement which subsumed the group discharge application submitted by the Illinois Attorney General. Under the Department's announcement, approximately 79,000 borrowers were to have their debts discharged due to Westwood's misconduct.[3]

---

[3] Press Release, U.S. Dep't of Educ, Education Department Approves $1.5 billion in Debt Relief for 79,000 Borrowers Who Attended Westwood College (Aug. 30, 2022) (available on Way Back Machine Internet Archive at https://web.archive.org/web/20230503064709/https://www.ed.gov/news/press-releases/education-department-approves-15-billion-debt-relief-79000-borrowers-who-attended-westwood-college)

The Department has failed to deliver on that promise. Although the Department indicates that only approximately 14,500 borrowers currently remain (out of the 79,000 initially estimated), most of those discharges predate July 2024. Since July 2024 (when the Department's reporting methodology changed), the Department has completed discharges for approximately 9,600 borrowers.[4] Assuming the same pace, it will take the Department approximately *twenty-one more months* to complete the discharges, *i.e.*, roughly five years from its August 2022 announcement (and more than 13 years from the initial submission by the Illinois Attorney General that gave rise to this lawsuit).[5] Although the Department says it will "strive" to complete discharges for all three categories of loans by the end of March 2027—fifteen months from now and nearly five years after this litigation was filed—it does not commit to doing so, regardless of whether the *Sweet* order is granted.

In addition to the pace, Plaintiffs are concerned about the Department's apparent inability to track this process with certainty. For example, the Department has referred to categories of loans as "possibly" incomplete because it is "unable to directly confirm that an adjustment of the correct amount has been made" because "loan servicers do not report the reasons for adjustments on loans." Likewise, the Department has elsewhere recognized and publicly acknowledged that it does not know the original balances of loans originated before 2005,[6] meaning that the Department

---

[4] Compare the information provided herein with ECF No. 36.

[5] 9,600 borrowers divided over 14 months results in 685 borrowers having their discharges completed each month. This calculation excluded the months the government was shut down.

[6] 89 Fed. Reg. 27,564, 27,573 (Apr. 17, 2024) ("The Department faces certain data limitations that make it impossible to accurately ascertain the balance upon entering repayment for loans disbursed before January 1, 2005.").

8

does not know the original balances of Westwood loans disbursed between January 1, 2002 and January 1, 2005.

The reasons given are problems of the Department's own making and provide little comfort. For example, as it does here, the Department has consistently informed Plaintiffs that it has needed to prioritize other loan discharges, apparently due to its settlement of *Sweet v. McMahon*, No. 3:19-cv-03674-WHA (N.D. Cal.).[7] *Sweet*, which is relevant here for reasons discussed *infra*, began as a lawsuit regarding the Department's unlawful delay in processing individual (rather than group) applications for borrower defense discharges filed by student loan borrowers. *See generally Sweet v. Cardona*, 121 F.4th 32 (9th Cir. 2024). Despite the complicated history of *Sweet* and the implementation of that settlement agreement, nothing about that case impacts the years that borrowers have waited for the Department to act here. For example, the workload problems the Department asserts *infra* that are caused by implementation of the *Sweet* settlement appear to relate to the *adjudication* of borrower defense claims—with an unknown number actually entitled to relief (to then be effectuated by third-party loan servicers). Even then, the Department has also indicated that it is in the process of contracting with and onboarding approximately 450 attorneys to help with that process and who may be ready to begin making determinations on *Sweet* applications by June 2026. *See* Decl. of James Bergeron ¶¶ 34–37, *Sweet* ECF No. 492-1 (Nov. 6, 2025).

As of this filing, the Department has declined to make any proposals on how to speed up the effectuation of Westwood relief.

---

[7] For sake of clarity, citations to the District Court's *Sweet* docket will be identified by ECF No.

   **3. Proposals for ways to increase the rate of discharges and, if rejected by opposing counsel, a fulsome explanation as to the reason for rejection of the proposal.**

Plaintiffs' Proposals:

   **I.   The Department should substantially complete providing relief by the end of April 2026, using the methodology employed without court order as part of the *Sweet* settlement.**

Plaintiffs propose that the Department commit to completing effectuating all relief promised in the August 2022 announcement by the end April 2026. To do so, Plaintiffs have proposed that Defendants employ the same methodology, procedures, and internal processes ultimately used to effectuate relief (including refunds, discharge, and credit reporting) for the "automatic relief" group in the *Sweet v. McMahon* case between April and October 2024. As of April 2024, we understand that there were approximately 47,755 borrowers entitled to automatically receive a discharge of loans (and refund of amounts paid) from attendance at the "Exhibit C" schools, but had not had that relief effectuated. *See* Suppl. Decl. of Richard Cordray ¶ 5(c), *Sweet* ECF No. 406-1 (April 23, 2024). By October 2024, after an agreement between the parties to deploy a new methodology (*i.e.*, the "terminal loan methodology") only 870 loans remained outstanding. *See* Transcript of Proceedings of Sept. 26, 2024 at 6:5-13, *Sweet* ECF No. 438. There is no reason why that methodology cannot be employed here. In the *Sweet* litigation, although the Department initially employed this methodology *without* court order, Judge Alsup later ordered the use of that methodology to speed up implementation of other aspects of the settlement agreement. *See* Minute Order, *Sweet* ECF No. 451, (Dec. 12, 2024) (ordering the "methods adopted for implementing relief for the Automatic Relief Group and later ordered for

the Decision Group One and Decision Group Two shall be used for [remaining decision groups].").[8]

At bottom, as part of the implementation of the *Sweet* settlement, the Department substantially completed discharges for roughly 47,000 borrowers (many of which had complicated consolidation loan issues) in the six-month period between April and October 2024. Plaintiffs propose that same methodology be used for the remaining 14,500 borrowers here and complete the process by April 2026.

The Department claims *infra*, as it did in *Sweet*, that using the terminal loan methodology will constitute a "windfall" for borrowers at "taxpayer expense." But the Department provides no data to support its assertions and instead relies on the fact that it suggested that methodology in *Sweet* only as a remedy for its breach of a settlement agreement (apparently caused by slow effectuation of discharges on consolidation loans). But here, the Department has breached its August 2022 promise to over 14,000 borrowers to discharge their Westwood-related student loan debt. As recently as last month, the Department has referred to this approach as a "streamlined methodology" that was "easier to implement" and led to "quicker" relief. *See* Defs.' Notice of Mtn. and Mtn. for Temp. Relief from Judgment at 7, *Sweet* ECF. No. 492 (Nov. 6, 2025). And as noted above, Judge Alsup ordered the use of that methodology to speed up implementation of other aspects of the settlement agreement. *Id.*

---

[8] Plaintiffs have also proposed that the Department and loan servicers use a single tracking mechanism to monitor adjustments, refunds, credit reporting, and NSLDS updates, akin to what was determined necessary to monitor relief in *Sweet* for a period of time but which is no longer being used. *See* Decl. of Richard Cordray ¶ 109(b), *Sweet* ECF No. 403-1 (April 2, 2024); *see also id.* at ¶ 96 (conceding that the Department had previously "failed . . . to establish a process to track the status of discharges for those loans").

Finally, any complexity relating to consolidation loans (and the asserted "windfall" that would come if the Department used the terminal loan methodology) is also a problem of the Department's own making both in terms of its ability to manage consolidation loans and in allowing borrowers to continue to incur debt to attend Westwood, and then consolidate that debt, during the roughly 15 year period that Westwood was determined by the Department to be defrauding students.

**<u>Defendants' Response to Plaintiffs' Proposal I:</u>**

The Department is unable to accept Plaintiffs' proposal that it extend the *Sweet* terminal loan methodology to Westwood borrowers. First, Plaintiffs' proposal, if accepted, would impose a substantial financial cost on taxpayers because, under the terminal loan methodology, a significant dollar amount of ineligible debt is discharged, and a significant amount of ineligible payments are refunded. This results in windfall relief to many borrowers at taxpayer expense. The Department proposed the methodology to the plaintiffs in *Sweet* only as a remedy for the Department's breach of the first relief deadline in the court-approved settlement[9] and objected to its use for any other groups of *Sweet* borrowers. Thereafter, the court, over the Department's objections, ordered the Department to use the methodology for all additional *Sweet* borrowers with mixed consolidation loans, even for those whose relief deadline had not yet passed at the time of the court's order.

Second, even if the Department were to agree to apply the terminal loan methodology to Westwood borrowers, the Department could not meet Plaintiffs' proposed April 2026 deadline.

---

[9] Plaintiffs assert that "the Department has breached its August 2022 promise to over 14,000 borrowers to discharge their Westwood-related" debt, *see supra* at 11, but discharging that debt is precisely what the Department is in the process of doing.

Instead, as explained above, *supra* at 5-6, subject to developments on the Department's pending extension motion in *Sweet*, the Department will strive to effectuate the remaining discharges for all three categories of loans in this case by the end of March 2027. At that time, if there are still Westwood borrowers with mixed consolidation loans that have not been discharged, the Department will propose a method to Plaintiffs for expeditiously discharging any remaining loans. Such a proposal may (but would not necessarily) include the terminal loan methodology and could include an alternative that would result in fewer discharges of ineligible debt and refunds of ineligible payments, resulting in less cost to taxpayers.

The Department again reiterates that all of the loans—Department-held or otherwise—for the three named Plaintiffs in this case have been discharged. *See, e.g.*, ECF No. 46 at 4. Moreover, all of the other Westwood borrowers' loans are in forbearance and thus borrowers are protected pending discharge.

**II.     Appoint a designated Department official to ensure that all of the Westwood discharges are effectuated for all borrowers and to answer borrowers' questions.**

As part of the effectuation of the *Sweet* settlement, the court ordered that the Department make the FSA Student Loan Ombudsman available as a resource for affected borrowers to pose questions regarding the effectuation of relief. *See* Minute Order, *Sweet v. Cardona*, ECF No. 407, (April 24, 2024). We propose that the Department once again publicize the name and email address of a specific individual at Federal Student Aid to address borrower issues as they arise, including with respect to the refund of payments made on loans related to a student's attendance at Westwood College.

**Defendants' Response to Plaintiffs' Proposal II:**

The Department is generally amenable to considering setting up a dedicated email box to which Westwood borrowers can submit questions regarding their discharges, including questions regarding any refunds made or owed. Before the Department can commit to this proposal, it needs to consider logistics, staffing, and availability of resources that would be needed. The Department is willing to confer with Plaintiffs regarding this proposal once it has considered those factors.

Dated: December 11, 2025

BRETT A. SHUMATE
Assistant Attorney General

MICHELLE R. BENNETT
Assistant Branch Director

/s/*Cristen C. Handley*       .
CRISTEN C. HANDLEY, MO Bar 69114
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 11520
Washington, DC 20530
Tel.: (202) 305-2677
E-mail: cristen.handley@usdoj.gov

*Counsel for Defendants*

Respectfully submitted,

/s/*Daniel A. Zibel*       
Daniel A. Zibel (D.C. Bar No. 491377)
Eric Rothschild (D.C. Bar No. 1048877)
NATIONAL STUDENT LEGAL
DEFENSE NETWORK
1701 Rhode Island Ave. NW
Washington, DC 20036
(202) 734-7495
dan@defendstudents.org
eric@defendstudents.org

Kyra Taylor* (D.C. Bar No. 1510681)
NATIONAL CONSUMER LAW CENTER
7 Winthrop Square, Fourth Floor
Boston, MA 02110
(617) 542-8010
ktaylor@nclc.org

Chavis Jones (D.C. Bar No. 1739219)
LAWYERS' COMMITTEE FOR CIVIL
RIGHTS UNDER LAW
1500 K Street, NW, Suite 900
Washington, DC 20005
Telephone: (202) 662-8600
Facsimile: (202) 783-0857
cjones@lawyerscommittee.org

*application for admission *pro hac vice* granted

*Attorneys for Plaintiffs*